UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,           :
                   Plaintiff,       :
                                    :
        v.                          :        Docket No. 1:11-cr-111-jgm-1
                                    :
LILLIAN RAMOS,                      :
                   Defendant.       :
_____:


MEMORANDUM AND ORDER ON DEFENDANT'S SUPPRESSION MOTION
(Doc. 45.)


I.      Introduction

        The Government has charged the Defendant, Lillian Ramos, with conspiracy to distribute

oxycodone in violation of 21 U.S.C. § 841(a)(1).  (Doc. 1.)  On May 21, 2012, Chief Judge Christina

Reiss granted the Defendant's motion to suppress all evidence obtained as a result of the illegal

search of her vehicle on January 14, 2010 in Brattleboro, Vermont.  (Doc. 31.)  The Defendant now

moves to suppress her subsequent confession on October 21, 2010 at her residence in Newark, New

Jersey.  (Doc. 45 at 1.)  In addition to asserting the confession is tainted by the illegal search of her

vehicle, the Defendant asserts Drug Enforcement Administration ("DEA") agents obtained it in

violation of her Fourth and Fifth Amendment constitutional rights.  Id. at 10-14.  The Government

opposes the motion.  (Doc. 51.)  The Court held evidentiary hearings on this motion on September

5, 2012 and October 2, 2012, at which Diversion Investigator Christopher Paquette, Jose Ramos,

Trooper Christopher Lora, and the Defendant testified.  (Doc. 63 ("Tr.1"); Doc. 78 ("Tr.2").)

Following the hearing, the Defendant and the Government filed further briefing.  (Doc. 85; Doc.

86; Doc. 88; Doc. 89.)

For the reasons stated below, the Defendant's motion is GRANTED IN PART and DENIED IN PART.

II.    Factual Background

The following facts are taken from the evidence presented at the September 5th and October 2nd hearings, as well as Judge Reiss's May 21st decision. Because the testimony from the hearings is riddled with factual disputes, the Court assessed the demeanor and credibility of the witnesses in making these findings. See United States v. Mendez, 315 F.3d 132, 135 (2d Cir. 2002) (granting "particularly strong deference" to factual findings "premised upon credibility determinations").

A.    The Investigation and Traffic Stop

In 2008 or 2009, DEA agents began an oxycodone trafficking investigation in the Burlington, Vermont area. (Tr.1 at 32.) The investigation focused on Larry Bushey, Jr., a Burlington resident, as well as Andres Malave from the Newark, New Jersey area. Id. at 8. The agents developed their case through physical surveillance, wiretaps, confidential informants, and controlled buys. Id. at 11, 32-34. The investigation resulted in the indictment of eighteen defendants in May 2010, including both Mr. Bushey and Mr. Colon. Id. at 8-9. Mr. Malave is also known as Luis Colon and by the nickname "Junior." Id. at 8; Tr.2 at 22. Investigator Paquette and Task Force Officer Justin Couture served as the principal case agents during the investigation. (Tr.2 at 78.)

On January 14, 2010, Vermont State Trooper Christopher Lora stopped the Defendant for speeding as she drove on the interstate in Vermont. (Doc. 31 at 2.) Following a brief exchange outside the Defendant's vehicle, an interview of her in his police cruiser, a canine alert on her vehicle, her detention at the police barracks for over three hours, and the issuance of a state search

warrant, Trooper Lora searched her vehicle and seized $6,900 in cash from its glove compartment.[1] Id. at 2-11. When a member of the Vermont State Police's ("VSP") drug task force attempted to turn the cash over to the DEA, the DEA declined to accept it. (Tr.2 at 5-6.) The VSP returned the cash to the Defendant within two to three weeks of its seizure. Id. at 8. Trooper Lora did not communicate with the DEA regarding the possible forfeiture. Id. at 5.

Investigator Paquette and Officer Couture learned of the seizure of $6,900 from the Defendant in February 2010. (Tr.1 44, 47-48; Tr.2 at 8-9, 13-15, 78-79.) The record is filled with vague, even contradictory testimony regarding their knowledge. Investigator Paquette struggled to recall his communications about the $6,900 with much specificity or concreteness. When pressed by defense counsel, Trooper Lora testified that Investigator Paquette contacted him in February to see whether the VSP still had the $6,900. (Tr.2 at 8-9, 14.) Investigator Paquette informed him that an investigation concerned the Defendant. Id. at 10. While Investigator Paquette could not recall the conversation, id. at 59-60, the Court credits the testimony of Trooper Lora, who had only peripheral involvement in the investigation. Id. at 10-12. Investigator Paquette, in contrast, served as one of its principal case agents, coordinating the investigation of numerous suspects. Id. at 78; Tr.1 at 8-9. His inability to recall a brief conversation made during a complex investigation does not rule out the possibility it occurred. A report of the surveillance drafted by Officer Couture in February 2010 confirms the agents learned of the seizure that month. (Tr.1 at 44, 47-48; Tr.2 at 79.)

In the course of the oxycodone trafficking investigation, the DEA agents identified Mr. Malave as a possible supplier of oxycodone to Mr. Bushey. (Tr.1 at 40.) The agents first observed

---

[1] An order issued on May 21, 2012 by Judge Reiss describes this stop and subsequent search in detail. (Doc. 31 at 2-11.)

the Defendant in Vermont on February 22, 2010[2] while investigating this relationship. Id. at 10.

The agents were surveilling a meeting between Mr. Malave and Mr. Bushey in the parking lot of a

steakhouse in South Burlington, Vermont. Id. Mr. Malave and a woman, later identified as the

Defendant, arrived at the meeting in a minivan. Id. at 10, 42. By running a registration check of its

plates, the agents learned that a rental car agency in New Jersey owned the minivan. Id. at 14-15,

42-43. The agents contacted that agency, which identified the Defendant as the minivan's lessee.

Id. at 16, 43. Through a photograph the agents obtained from the New Jersey Department of

Motor Vehicles, the agents established that the woman that accompanied Mr. Malave was the

Defendant. Id. at 10.

The testimony at the hearings connected neither the surveillance at the steakhouse nor the

Defendant's subsequent identification following it to the traffic stop in January 2010. The

Defendant was not a person of interest to the DEA in January, according to Investigator Paquette.

Id. at 35. The Narcotics and Dangerous Drug Information System, an intelligence database

maintained by the DEA, first names the Defendant in an entry describing the surveillance in

February. Id. at 38.

Following the surveillance at the steakhouse, the agents observed the Defendant in Vermont

on about six additional occasions. Id. at 9. The agents observed her in parking lots in the

Burlington area, as well as a hotel. Id. at 10-11. In addition to physical surveillance, including some

video surveillance, the agents used records obtained from rental car agencies and hotel companies to

---

[2] Whether the agents' awareness of the seizure predates February 22nd is unclear from the record. Trooper Lora testified the VSP returned the $6,900 "within two or three weeks of the seizure" on January 14, 2010, i.e. the last week of January 2010 or the first week of February 2010. (Tr.2 at 8.) Investigator Paquette first contacted him "shortly after" its return. Id. Because "shortly after" is an imprecise term, potentially encompassing a few days, several weeks, or a month, the Court is unable to find the agents knew of the seizure before February 22nd.

further establish her presence in Vermont. Id. at 9-11. The agents also identified the Defendant's telephone number on the toll records for Mr. Malave's phone. Id. at 34.

     B.    The Interview

On October 21, 2010, Investigator Paquette and another DEA agent from Vermont, Thomas Doud, traveled to Newark to conduct a "knock and talk" at the Defendant's residence. Id. at 16-17, 54. Two DEA agents from New Jersey accompanied them there. Id. at 17-18. The agents did not schedule an interview with the Defendant, instead showing-up unannounced. Id. at 54-55.

The agents arrived at the Defendant's residence after dark on the 21st. Id. at 18, 55, 71. The residence is comprised of a first-floor apartment, where the Defendant lives, as well as an upstairs apartment, where her father lives. Id. at 70, 83. When the agents rang the doorbell, her father answered the front door. Id. at 72. Her father informed the agents in Spanish that the Defendant was picking-up dinner and would return soon. Id. at 19, 72-73. The agents waited for the Defendant in her driveway for approximately ten minutes. Id. at 19.

When she arrived at her residence, the Defendant parked her car in the driveway. Id. at 20, 92-93. The agents next introduced themselves and explained that they needed to talk with her privately about Mr. Malave inside her apartment. (Tr.2 at 20.) The Defendant responded that she had "nothing to talk about 'cause I don't know nothing." Id. The Defendant claims she asked whether the agents needed a warrant next, causing them to reply that they did not need one. (Tr.1 at 93; Tr.2 at 20-21, 53.) She also testified that she never explicitly invited the agents inside. (Tr.2 at 21, 47.) Testifying through a Spanish interpreter, her father corroborated that she asked for a warrant and never invited the agents inside. (Tr.1 at 75.) Investigator Paquette disputes this testimony. Id. at 21-22, 58. He testified that the Defendant never asked about a warrant. Id. He

also testified she invited the agents into her apartment because she did not want her father to hear the conversation.  Id.  His report of the interview states the Defendant "invited [the agents] into her residence to speak more privately with them."  (Ex. 1 at 1.)

The Court credits Investigator Paquette's testimony here: the Defendant never asked about a warrant and, despite her initial reluctance, invited the agents inside her apartment.  The Court makes this finding based largely on its evaluation of each witnesses' demeanor at the hearing.  Investigator Paquette testified confidently regarding the warrant, while the Defendant appeared to waffle. Inconsistencies in her testimony, as well as its timing, also support this determination.  The Defendant testified she did not want her father to know about her involvement in oxycodone trafficking, yet subsequently claimed that she would have felt more comfortable if he was there. (Tr.2 at 44-46.) Furthermore, the Defendant moved to suppress the interview only after the Court invalidated the warrant Trooper Lora obtained before searching her vehicle.  (Doc. 31 at 26-27.) This first suppression order made the importance of warrants very clear, perhaps motivating her to modify her account of the interview.  The Court also did not find her father's testimony particularly persuasive.  Because he testified through a Spanish interpreter and acknowledged he only understood English "a little bit," the Court is unwilling to credit his testimony that he never heard his daughter invite the agents inside, but did hear her ask about a warrant, over Investigator Paquette's contrasting account.  (Tr.1 at 75, 78.)  Furthermore, his acknowledgment that he had no knowledge of his daughter's involvement in oxycodone trafficking before the interview bolsters Investigator Paquette's testimony that she invited the agents inside to prevent her father from learning about it.  Id. at 77-78.

Following the exchange in the driveway, the Defendant testified she entered her apartment, with the agents following behind her. (Tr.2 at 21, 46-47.) When the Defendant's father attempted to follow them, the agents told him to stay out. Id. at 21; Tr.1 at 75, 94-95.

Once inside the apartment, the agents closed its door and told the Defendant to have a seat. Tr.1 at 88. The agents neither placed her in handcuffs, displayed firearms, nor apprised her of her Miranda rights. (Tr.1 21, 97; Tr.2 at 30, 48.) The Defendant then consented to a search of the apartment to ensure no one else was inside it. (Tr.1 at 23, 95-96.) Investigator Paquette testified that the agents "made it clear to [the Defendant] that no matter what she told us that evening . . . other than maybe a homicide, that we would be gathering our information and we would be leaving." Id. at 20-21. He also informed the Defendant that she was not under arrest and that the agents would leave if requested to do so. Id. While the Defendant denies that Investigator Paquette told her she could terminate the interview, the Court credits Investigator Paquette here. (Tr.2 at 22.) He testified confidently regarding this statement at the hearing, and his report of the interview corroborates his testimony. (Ex. 1 at 1.) The Defendant acknowledged at the hearing that she understood she was not under arrest. (Tr.2 at 51.)

The agents next interviewed the Defendant in a small room located in the front of her apartment. (Tr.1 at 22, 94-96.) Investigator Paquette and the Defendant offered conflicting testimony regarding the position of each agent during the interview. Compare id. at 23 with id. at 96-98. Because she appeared to recall the encounter more vividly at the hearing, the Court credits the Defendant's testimony on these positions. She testified that Investigator Paquette sat next to her on a two-cushion couch; Agent Doud sat across from them on a larger couch by the front door; an agent stood with his back to the front door; and another agent stood by a television set near the couches. Id. at 88, 96-98.

The interview lasted about an hour. Id. at 26. Investigator Paquette and Agent Doud primarily asked the questions during it, with another agent asking a few also. Id. at 23. The agents generally did not raise their voices, instead speaking softly throughout most of the interview. Id. at 24, 26. Investigator Paquette became "a little agitated" at the beginning of the interview, speaking in a "strong voice, [but] not screaming." (Tr.2 at 26.) The Defendant was "somber and crying." (Tr.1 at 24.) She became particularly upset when discussing the incarceration status of her boyfriend, Mr. Malave. Id.

The Defendant testified that the agents spent the first thirty minutes of the hour-long interview persuading her to talk. She explained that the agents informed her that she might serve twenty years in prison, lose her children, and lose her job, if she did not talk to them. Id. at 98; Tr.2 at 24-25. The agents also asked the Defendant if she knew Mr. Malave "had other girls . . . [and] was just using [her]." (Tr.1 at 98.) The Defendant testified the agents insisted that Mr. Malave "didn't love [her] . . . didn't care for [her], that he had put [her] through all this." (Tr.2 at 24.) The Defendant further testified that the agents told her they had found her fingerprints on candy bags Mr. Malave used to conceal oxycodone. Id. at 50, 57; Tr.1 at 99. The agents informed her that they knew about the vehicle stop in Vermont and the seizure of $6,900. (Tr.2 at 26-27.) The agents told her they could help her out, even talk to the judge, if she cooperated with them. (Tr.1 at 99-100.) One of the agents attempted to relax the Defendant by telling her "that nothing was going to happen to [her]" in Spanish. (Tr.2 at 26, 52.) The Defendant explained that the agents kept asking her questions, causing her to feel "pressured" to answer them. (Tr.1 at 100.)

Investigator Paquette disputed the Defendant's account, describing her as forthcoming initially. Id. at 60. Based on the demeanor of both witnesses at the hearings, the Court finds the Defendant's testimony more credible. Her testimony is also more consistent with the other

evidence in the record.   The Court seriously doubts that the Defendant, without any psychological

pressure, would divulge incriminating information to the agents when confronted in the comfort of

her apartment.   Indeed, when Trooper Lora asked to search her vehicle on a highway in Vermont

earlier that year, she refused to consent to the search.  (Doc. 31 at 5-9.)  The Court is also troubled

that Investigator Paquette asserted the agents never attempted to break the Defendant down, yet

acknowledged telling the Defendant that Mr. Malave "doesn't love you, he doesn't care for you, he

just used you."  (Tr.1 at 61.)  While he later clarified that he made that statement near the end of the

interview, the Court is unsure what purpose, other than to assert psychological pressure, the

statement could have served.  Id. at 68.  Both Investigator Paquette and the Defendant testified that

the agents never made any promises to her in exchange for her cooperation.  Id. at 26-27; Tr.2 at 52.

The Defendant felt "scared . . . [and] cornered" when she began speaking with the agents

about her knowledge of Mr. Malave's oxycodone distribution.  (Tr.1 at 100; Tr.2 at 24.)  The

Defendant then identified Mr. Malave's source of supply, revealed she had purchased candy bags for

him to conceal oxycodone in, explained that he transported oxycodone and drug proceeds to

Vermont, stated she had accompanied him on eight trips there, and described several of his

associates in the Burlington area.  (Ex.1 at 1-4; Tr.1 at 53; Tr.2 at 49-50.)  When asked about the

$6,900 the VSP seized from her in January 2010, the Defendant responded that she had placed it in

her glove compartment after Mr. Malave picked it up in Burlington.  (Ex. 1 at 3.)  Investigator

Paquette testified that the Defendant told him she knew the $6,900 was drug proceeds in January

2010.  (Tr.1 at 25-26.)  The Defendant disputes making this admission.  She insists she only learned

about Mr. Malave's oxycodone trafficking when she visited him in prison following his arrest.[3]  (Tr.2 at 24.)

The agents concluded the interview by informing the Defendant they were unsure whether she would be a witness or a defendant in the case.  (Tr.1 at 27-28.)  The agents also asked whether she would testify before the grand jury.  Id.  Investigator Paquette took contemporaneous notes during the interview and drafted his report of it about three months later.  Id. at 64-66; Ex. 1 at 1.  As they left, the agents warned that "they are going to come back and next time it's not going to be pretty."  (Tr.1 at 99; Tr.2 at 57.)

C.    The Suppression Order

On May 21, 2012, Judge Reiss issued an order suppressing evidence obtained during the January 14, 2010 stop of the Defendant's vehicle by Trooper Lora.  (Doc. 31.)  The order suppressed: (1) statements she made in response to questioning inside his police cruiser; (2) evidence of the canine alert on her vehicle; and (3) evidence derived as a result of a state search warrant he obtained, including the seizure of $6,900 in cash.  Id. at 24-27.  Judge Reiss's order hinged on her determination that Trooper Lora's questioning of the Defendant inside his police cruiser constituted an unwarned custodial interrogation in violation of Miranda v. Arizona.  Id. at 23-24.  Judge Reiss described this determination as a "close call" and a "close question," id. at 19, 23, but nevertheless unconstitutional.

> [A] contrary conclusion would mean that it is constitutionally permissible for a law enforcement officer to order a suspect in a

---

[3]  The Court is not particularly convinced by this explanation.  When confronted with other evidence of his oxycodone trafficking, the Defendant undermined her credibility further through similarly implausible testimony.  See, e.g., Tr.2 at 38 (explaining that she drove from New Jersey to Vermont in a rental car to shop for a new car and visit a friend she had lost touch with); Tr.2 at 40-43 (explaining that she believed Mr. Malave was checking the oil of rental vehicles when she observed him opening their hoods while meeting friends in parking lots).

> routine traffic stop to sit and remain in his cruiser and submit to
> approximately thirty minutes of accusatory questioning, well beyond
> that necessary for a routine traffic stop, without the ability to leave,
> communicate with others, or access personal belongings, and without
> the benefit of <u>Miranda</u> warnings.

<u>Id.</u> at 23. In the absence of statements given during this interrogation, Judge Reiss concluded

Trooper Lora acted unreasonably in detaining the Defendant for thirty-five minutes to effect a

canine search. <u>Id.</u> at 24-25. In turn, the search warrant he obtained, without evidence obtained

during the canine search, lacked probable cause. <u>Id.</u> at 26-27.

Judge Reiss suppressed neither the fact of the traffic stop in Vermont nor the Defendant's

initial exchange with Trooper Lora. <u>Id.</u> at 24-27. During this exchange, the Defendant told Trooper

Lora that she was driving from Burlington to Newark in a rental vehicle. <u>Id.</u> at 2. In her first

motion to suppress, the Defendant did not seek to suppress the October 21, 2010 interview at her

apartment in Newark. (Doc. 14 at 7.)

III.     <u>Discussion</u>

    A.     <u>Timeliness</u>

The Government asserts the Defendant has waived this second round of suppression

arguments by failing to comply with this Court's scheduling order. (Doc. 51 at 4.) The Court

originally set a December 18, 2011 motions deadline in this case. The Defendant filed a motion the

day after that deadline, in which she sought to suppress the seizure of $6,900 from her vehicle in

January 2010. (Doc. 14.) Judge Reiss granted this first suppression motion on May 21, 2012 and

denied the Government's motion to reconsider on June 4, 2012. (Doc. 31; Doc. 35.) In moving to

compel the disclosure of grand jury transcripts on July 2, 2012, the Defendant represented that she

intended to file a second suppression motion. (Doc. 41 at 2.) The Court issued an order setting a

filing deadline for this proposed motion, to which the Government raised no immediate objection.

(Doc. 42.)  In compliance with that order, the Defendant filed this motion on July 13, 2012.  (Doc. 45.)

Federal Rule of Criminal Procedure 12(e) provides that a defendant who fails to move to suppress evidence "by the deadline the court sets under Rule 12(c) or <u>by any extension the court provides</u>" waives his or her ability to do so.  Fed. R. Crim. P. 12(e) (emphasis added) (also providing an exception for "good cause").  Because the Court provided the Defendant an extension to file her second suppression motion, there is no waiver here.  A district court may extend the deadline for filing a suppression motion under Rule 45(b)(1), which provides:

> (1) In General.  When an act must or may be done within a specified period, <u>the court on its own may extend the time</u>, or for good cause may do so on a party's motion made:
>
> (A) before the originally prescribed or previously extended time expires; or
>
> (B) after the time expires if the party failed to act because of excusable neglect.

Fed. R. Crim. P. 45(b)(1) (emphasis added).  Following the Defendant's representation that she intended to file a second suppression motion, the Court exercised its discretion under Rule 45(b)(1) and extended the motions deadline in this case.  The Court did so "on its own," issuing a scheduling order that stated "[a]ny anticipated motions to dismiss or suppress statements shall be filed by July 16, 2012."  (Doc. 42 at 2.)

The Court permissibly extended the deadline for filing suppression motions.  Rule 45(b)(1) does not require excusable neglect if, as here, a district court exercises its discretion to extend a deadline on its own.  <u>But see</u> <u>United States v. Stein</u>, 440 F. Supp. 2d 315, 325-26 (S.D.N.Y. 2006) (finding excusable neglect despite granting extension on its own motion).  When it decided in June 2012 to extend the suppression motion deadline, the Court recognized the Defendant's failure to

move to suppress her confession constituted excusable neglect. Excusable neglect is an "'elastic concept,' implying a determination that is 'at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.'" Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d Cir. 2003) (quoting Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 392, 395 (2003)). A court should consider the following factors in evaluating it: "[1] the danger of prejudice to the [non-movant], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." Id. (quoting Pioneer Inv. Serv. Co., 507 U.S. at 395). Excusable neglect's parameters are "informed by, and roughly congruent with, the interests of justice." Stein, 440 F. Supp. 2d at 324 (internal quotations omitted).

While the better practice is to address all illegally obtained evidence in one suppression motion, the Defendant's decision to file successive motions is understandable. The first motion addressed the traffic stop in January 2010 by the VSP; her second motion addresses a subsequent interview by the DEA in October 2010 in New Jersey. To determine whether the interview constitutes fruit of the poisonous tree, the Court first had to determine whether the stop was illegal. Had the Court found the first stop legal, the Court would have had no need to develop a record regarding its taint. The scope of the second motion thus depended on the outcome of the first motion. Balancing the delay caused by the Defendant's procedural approach against the constitutional and liberty interests at stake, the Court exercised its discretion and extended the suppression motion deadline. (Doc. 89 at 4.)

Nor was the Government especially prejudiced by the extension. The Government suggests it might have appealed the suppression of the $6,900 had it known the Defendant would also seek to suppress her statements regarding these funds. (Doc. 85 at 3-4.) The procedural history of this

case does not support this assertion.  The thirty-day window for the Government to appeal began

running on June 4, 2012, when Judge Reiss denied its motion for reconsideration.  Canale v. United

States, 969 F.2d 13, 14-15 (2d Cir. 1992).  Because the Defendant represented in a July 2, 2012

motion that she intended to challenge these statements, the Government had notice before the

appeal period ran.

      B.     Fruit of the Poisonous Tree

The Defendant moves to suppress the interview at her apartment in Newark on October 21,

2010 as fruit of the poisonous tree under Wong Sun v. United States, 371 U.S. 471 (1963).  The

Defendant asserts the illegal search of her vehicle on January 14, 2010, as well as her illegal detention

and interrogation before it, taints the interview.  (Doc. 45 at 8.)  The Government responds that this

traffic stop is too attenuated to taint the interview and that applying the exclusionary rule to the

interview would serve no deterrent purpose.  (Doc. 51 at 8-9.)

The exclusionary rule generally subjects "[e]vidence obtained from an unlawful search or

seizure . . . to exclusion" as fruit of the poisonous tree.  Mosby v. Senkowski, 470 F.3d 515, 520 (2d

Cir. 2006).  The rule extends to both direct and indirect products of unconstitutional conduct,

including verbal statements.  Wong Sun, 371 U.S. at 485-86.  A court should inquire whether,

"granting the establishment of the primary illegality, the evidence . . . has been come at by

exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the

primary taint."  Id. at 488 (internal quotation omitted).  This inquiry "does not hinge on a simple

'but for' analysis, but rather, 'must be answered on the facts of each case.'"  United States v.

Thompson, 35 F.3d 100, 105 (2d Cir. 1994) (quoting Brown v. Illinois, 422 U.S. 590, 603 (1975)).

"The relevant constitutional question is 'whether the connection between the lawless conduct of the

police and the discovery of the challenged evidence has become so attenuated as to dissipate the

taint.'" Mosby, 470 F.3d at 520 (quoting United States v. Ceccolini, 435 U.S. 268, 273-74 (1978). In making this determination, the following factors are relevant: "(1) whether a Miranda warning has been given and waiver obtained, (2) the temporal proximity of the illegal seizure and the contested statement, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." Thompson, 35 F.3d at 105 (citing Brown, 422 U.S. at 603-04) (numerals added). The government bears the burden of showing admissibility. Id.

The Government has proved the taint of the illegal stop in January 2010 had dissipated before the confession in October 2010. While the agents did not apprise the Defendant of her Miranda rights between these events, the illegal stop is both temporally distant and causally distinct from the confession. During the ten-month gap between the stop and the confession, the agents repeatedly observed the Defendant in Vermont with Mr. Malave, a principal suspect in their oxycodone investigation. The agents even observed the Defendant accompany him to the scene of suspected drug transactions. Through records obtained from rental car agencies and hotel companies, the agents learned the Defendant's name and address. The agents' investigation provided them with independent reasons, apart from the suppressed evidence, to interview the Defendant in Newark.

This finding is subject to one caveat. In her supplemental briefing, the Defendant focuses on suppressing responses she provided to the agents regarding the $6,900. (Doc. 86 at 1-2.) "When a defendant is confronted by law enforcement with incriminating evidence obtained by an illegal search and then makes admissions about that evidence, it is ordinarily obvious that there has been an exploitation of the illegality." United States v. Griswold, No. 09-CR-6174, 2011 WL 7473466, at *11 (W.D.N.Y. June 2, 2011). The courts suppress such evidence "because the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak." 6 Wayne R.

LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 11.4(c) (4th ed. 2004) (internal quotations omitted). Except for the illegal search of her vehicle in January 2010, the agents would not have known to question the Defendant about the $6,900. The agents exploited the illegal search by questioning her regarding the $6,900, including where she obtained it.

The effect of this exploitation is limited to her responses regarding the $6,900 only. The record does not establish the Defendant would have remained silent if the agents had not mentioned it. The agents did not rely solely on the seizure of $6,900 to encourage her to speak, instead stressing her romantic relationship with Mr. Malave, the possibility of a twenty-year sentence, the loss of her children and job, and the benefits of cooperation. When asked what caused her to speak, the Defendant first emphasized these factors at the hearings. <u>See</u> Tr.1 at 98-99, Tr.2 at 23-24. She only mentioned the $6,900 in response to a specific question from defense counsel regarding it. Tr.2 at 26-27. The illegally seized $6,900 was just one motivating factor; her wide-ranging confession did not hinge on it. The Court concludes the Defendant's answers to questions regarding the $6,900 constitute fruit of the poisonous tree. The rest of her confession does not.

The purposefulness and flagrancy of Trooper Lora's conduct supports this approach. This final factor "reflects the policies of deterrence and judicial integrity underlying the exclusionary rule." <u>Mosby</u>, 470 F.3d at 523. An illegality designed to advance an investigation, or "embarked upon . . . in the hope that something might turn up," is viewed disfavorably under it. <u>Brown</u>, 422 U.S. at 605. Instead of issuing a speeding ticket, Trooper Lora began investigating the circumstances of the Defendant's travel plans immediately after stopping her vehicle. (Doc. 31 at 13.) Judge Reiss found that, while constitutionally permissible, he lacked an "objective basis for doing so." <u>Id.</u> She explained that "[t]he initial roadside encounter was thus primarily focused on whether there were any additional facts that might require additional investigation." <u>Id.</u> at 14. The custodial

interrogation of the Defendant in the police cruiser, as well as her detention at the police barracks, likewise served an investigatory purpose. Id. at 16, 22. The constitutional violation here stems from Trooper Lora's efforts to transform a routine traffic stop into a narcotics investigation. By suppressing the Defendant's subsequent statements regarding the $6,900 he seized, the Court seeks "to compel respect for the constitutional guaranty in the only effectively available way–by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217 (1960). Because the DEA agents had independent, untainted reasons to interview the Defendant, however, suppressing her entire confession would go too far. Based on the facts of this case, suppression of the Defendant's statements regarding the $6,900 is warranted under the fruit of the poisonous tree doctrine.

Yet this ruling does not end the Court's inquiry. The Supreme Court recently made it clear in Davis v. United States, 131 S. Ct. 2419 (2011), and United States v. Herring, 555 U.S. 135 (2009), that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." Davis, 131 S. Ct. at 2426. "Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." Id. (internal quotations omitted). The exclusionary rule is therefore inapplicable "[w]here suppression fails to yield appreciable deterrence." Id. (internal quotations omitted). "Real deterrent value is a 'necessary condition for exclusion,' but it is not 'a sufficient' one." Id. at 2427 (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)). "[T]he deterrence benefits of suppression must [also] outweigh its heavy costs." Id. These benefits "[v]ary with the culpability of the law enforcement conduct." Id. (quoting Herring, 555 U.S. at 143). The deterrent benefit is strong and tends to outweigh the costs of exclusion when law enforcement exhibit "deliberate, reckless or grossly negligent disregard for Fourth Amendment rights." Id. (internal quotations omitted). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence,

the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. (internal quotations omitted).

Relying on Davis and Herring, the Government asserts the exclusionary rule is inapplicable here because suppressing the confession would not deter unconstitutional conduct. (Doc. 51 at 8.) The Government applies the exclusionary rule analyses in Davis and Herring to Trooper Lora, asserting that he neither recklessly nor intentionally violated the constitution. (Doc. 88 at 3-4.) Trooper Lora detained the Defendant in his police cruiser for thirty-five minutes without administering Miranda warnings. He lacked an objective basis for his initial questioning of the Defendant. While the Court recognizes the need to combat opiate distribution in Vermont (Doc. 51 at 11-12), the Court concludes that suppression is warranted here. The deterrent benefit outweighs the costs of exclusion.

The Government also contends that the DEA agents had no reason to doubt the propriety of the seizure of $6,900 because Trooper Lora discovered it pursuant to a state search warrant. (Doc. 51 at 8.) The DEA agents therefore acted reasonably, according to the Government, in asking the Defendant about the illegally seized funds. Id. at 9. While this assertion is correct, it is not particularly persuasive. The illegality here is the $6,900 illegally seized by Trooper Lora. The critical inquiry is therefore the effect exclusion would have on him. If the Court admits statements regarding these funds simply because the agents subsequently confronted the Defendant about them, that effect would erode substantially.

C.      Warrantless Entry

The Defendant contends the DEA agents violated the Fourth Amendment by entering her home without a warrant. (Doc. 45 at 10.) The Fourth Amendment "ordinarily prohibit[s] the warrantless entry of a person's house as unreasonable per se." Georgia v. Randolph, 547 U.S. 103,

109 (2006). If an occupant voluntarily consents to the entry, however, there is no Fourth Amendment violation. Id. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). When it is "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority," consent is voluntary. United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." Id. at 423 (internal quotations omitted). The government must prove voluntary consent by a preponderance of the evidence. United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004).

The Government has met its burden of proof. While the four agents outnumbered the Defendant and her father, approached her after dark, and first proposed they speak inside, the Defendant consented to prevent her father from learning about Mr. Malave's criminal activities. The agents did not draw their guns. Nor did they threaten the Defendant with consequences if she refused consent. There is also no evidence the agents wore her down before she consented. The totality of the circumstances provide the agents with a reasonable basis for believing the Defendant voluntarily consented.

D.     Miranda v. Arizona

The Defendant asserts that her confession in her apartment is the result of an unwarned custodial interrogation in violation of Miranda v. Arizona, 384 U.S. 436 (1966). A suspect is "in custody" for Miranda purposes if there was "a formal arrest or restrain on freedom of the degree associated with a formal arrest." J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (internal quotations omitted). "Two discrete inquiries are essential to this determination: first, what were the

circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[.]" Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). The test for whether a suspect is in custody is not subjective; it depends instead "on how a reasonable person in the suspect's position would view the situation." United States v. FNU LNU, 653 F.3d 144, 151 (2d Cir. 2011). A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation. See United States v. Cunningham, No. 11-CR-65, 2012 WL 369923, at *3 (D. Vt. Feb. 3, 2012).

To determine what a suspect is in custody, a court must "examine all of the circumstances surrounding the interrogation." J.D.B., 131 S. Ct. at 2402 (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)). These circumstances include, inter alia:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion . . . ; and, now, a juvenile suspect's age, if known to the officer or readily apparent. The circumstances also include, and especially so in border situations, the nature of the questions asked.

FNU LNU, 653 F.3d at 151 (internal quotations and citations omitted.)

The Defendant has not established she was in custody for Miranda purposes. The Defendant invited the agents into her home, a familiar setting typically deemed non-custodial. United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004). The hour-long interview was not a "marathon session designed to force a confession." Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (two-hour interrogation non-custodial). At its outset, the agents made it clear to the Defendant that she was not under arrest and could ask them to leave at any point. United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (highlighting that agents told defendant he could ask them

to leave at any time). The agents also remained relatively calm during it, seldom raising their voices. The DEA agents did not handcuff the Defendant during it. <u>Newton</u>, 369 F.3d at 676 (describing "[h]andcuffs . . . as a hallmark of a formal arrest"). The Court is mindful that some circumstances surrounding the confession do weigh in the Defendant's favor. The agents interviewed the Defendant at night, outnumbered her four-to-one, arrived unannounced, sat in close-proximity to her, blocked the front door, searched her apartment, emphasized the consequences of non-cooperation, and played on her romantic relationship with Mr. Malave. Viewing all the circumstances surrounding the confession together, however, the Court concludes that a reasonable person would have felt free to terminate the questioning and ask the agents to leave. The Defendant's confession is not the product of a custodial interrogation. There was no <u>Miranda</u> violation.

      E.    <u>Voluntariness</u>

     The Defendant asserts that the agents violated her self-incrimination and due process rights by inducing her to confess involuntarily. (Doc. 45 at 12-13.) A confession is involuntary and thus inadmissible if "a defendant's will was overborne by the circumstances surrounding [it]." <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000) (internal quotations omitted). In applying this totality of the circumstances test, the courts consider: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." <u>Green v. Scully</u>, 850 F.2d 894, 901-02 (2d Cir. 1988). The government bears the burden of proving the voluntariness of a defendant's confession. <u>United States v. Orlandez-Gamboa</u>, 320 F.3d 328, 333 (2d Cir. 2003).

     The Defendant confessed voluntarily. In contrast to the "in custody" analysis above, the Defendant's personal characteristics are relevant here. <u>Dickerson</u>, 530 U.S. at 434 (explaining that voluntariness determinations "depend[] upon a weighing of the circumstances of pressure against

the power of resistance of the person confessing") (internal quotations omitted).  These

characteristics weigh against an involuntariness finding.  The Defendant appeared intelligent, hard-

nosed, and assertive at the hearings.  She also has previously held her ground when confronted by

law enforcement.  The conditions of the interrogation and the conduct of the DEA agents, as

described in the <u>Miranda</u> section above, likewise support a voluntariness finding.

The Court reaches this conclusion although the DEA agents asserted some psychological

pressure on the Defendant.  In addition to playing on her romance with Mr. Malave, the agents

outlined the consequences of non-cooperation, including the possibility of prison time, the loss of

her children, and the loss of her job.  The references to Mr. Malave stop far short of overbearing the

Defendant's will.  Nor do the statements regarding the possible consequences of non-cooperation

push the Defendant much closer.  The agents suggested she might avoid these consequences by

cooperating, but never made any explicit promises to the Defendant.  "[T]he Second Circuit has

made clear that simply stating that cooperation may help a defendant facing a lengthy sentence is

not enough to render a statement subsequently made involuntary."  <u>United States v. Dominguez-

Gabriel</u>, No. 09-CR-157, 2010 WL 1915044, at *9 (May 12, 2010) (citing cases).  Investigator

Paquette also offset the impact of these statements by informing the Defendant, near the start of the

interview, that the agents did not intend to arrest her that day.  Having evaluated the totality of the

circumstances surrounding her confession, the Court concludes that it is the product of her free and

unfettered choice.

IV.     Conclusion

For the above reasons, the Defendant's motion to suppress (Doc. 45) is GRANTED IN PART and DENIED IN PART.  The Court suppresses statements the Defendant made to DEA agents on October 21, 2010 regarding the $6,900 found in her vehicle on January 14, 2010.  The remainder of the Defendant's confession is admissible at trial.

This case will be placed on the January 24, 2013 trial calendar.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 26th day of December, 2012.


/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge